[Civil No. 362.  Filed January 25, 1893.]

[33 Pac. 418.]

## THE WATERVALE MINING COMPANY OF CHICAGO, Plaintiff and Appellant, v. C. W. LEACH et al., Defendants and Appellees.

1. MINES AND MINING — LOCATIONS — EXTRALATERAL RIGHTS — REV. STATS. U. S. 1878, SECS. 2319, 2322, CITED.—Sections 2319 and 2322, *supra,* give all lodes, veins, and ledges, throughout their en-

tire depth, the tops or apexes of which lie inside of the surface lines of the claim extended downward vertically; and as lodes may dip and extend beyond the boundaries of the claim, they may be followed, but the locator shall be entitled only to such part thereof as lies between vertical planes drawn downward through the end-lines of the claim.

2. SAME—EXTRALATERAL RIGHTS.—A locator may in two instances pursue a lode beyond the limits of his claim: First, when the lode, having the apex within the boundaries of his claim, shall dip beyond them; and second, when he shall have located a lode prior to the tenth day of May, 1872, under the mining laws then in force, and shall, as against a subsequent and overlapping claim, have saved his right to his lode in the manner prescribed in the act of 1872. In the latter case the prior locator may follow his lode, upon its strike or dip, into other ground than his own.

3. SAME—CROSS-LODES—REV. STATS. U. S. 1878, SEC. 2336, CITED.— Section 2336, *supra,* provides that, at the space of intersection of lodes crossing, the oldest locator shall have the ore, and the junior locator shall have a right of way through the space to pursue and work his lode; that if there be a union of two lodes, the senior locator shall take the ore at the space of intersection or union, and all of the lode below the point of union.

4. SAME—LOCATION—CROSS-LOCATIONS—LENGTH OF CLAIM—SIDE-LINES TREATED AS END-LINES.—It is not essential to the validity of a mining claim that it be located along the course of the lode. The statute provides that the extreme extent along the lode shall not exceed fifteen hundred feet. It may be less. If the side-lines, instead of the end-lines, cross the course of the lode, in order to define the locator's rights to pursue the lode on its dip, the side-lines will be treated as the end-lines.

5. SAME—REV. STATS. U. S. 1878, SEC. 2336, CONSTRUED.—The expression, the "ore within the space of intersection," used in section 2336, *supra,* means that body of ore bounded by the foot- and hanging-walls of one lode, extended in a general course of that lode, and the foot- and hanging-walls of the intersecting lode, extended upon its general course. It is only to this body of ore that section 2336 relates.

6. SAME—EXTRALATERAL RIGHTS—NO RIGHT TO GO OUTSIDE ON STRIKE OR COURSE, EXCEPT ON LOCATIONS PRIOR TO 1872—REV. STATS. U. S. 1878, SEC. 2322, CITED.—By section 2322, *supra,* a locator cannot go outside of any of his lines on the strike or course of any lode, except under rights acquired by him prior to the enactment of 1872, and saved to him under the provisions of that act.

7. STATUTORY CONSTRUCTION — CONFLICTS — WHEN OPERATE TO REPEAL. —The canon of statutory construction that as between conflicting sections of the same statute the last in the order of arrangement

shall prevail is applicable only where no reasonable construction will harmonize the parts.

8. MINES AND MINING—REV. STATS. U. S. 1878, SECS. 2322, 2336, IN HARMONY—SECTION 2336 CONSTRUED. — Sections 2322 and 2336, *supra,* are in complete harmony. Section 2336 gives no new rights beyond those granted by section 2322, but defines and settles prior existing rights at the space of intersection.

9. SAME—CROSS-LODES—DIP—STRIKE—REV. STATS. U. S. 1878, SEC. 2336, CONSTRUED.—Section 2336, *supra,* defines the rights of locators in the space of intersection of lodes crossing or uniting on the dip, and has no reference to crossing of lodes on the strike.

DISMISSED ON MOTION OF APPELLANTS. —*Leach* v. *Watervale Mining Co.,* 159 U. S. 258, 40 L. Ed. 147, 15 Sup. Ct. Rep. 1040.

APPEAL from a judgment of the District Court of the First Judicial District in and for the County of Cochise. Richard E. Sloan, Judge. Reversed.

The facts are stated in the opinion.

W. H. Stilwell, for Appellant.

From a careful reading of section 2336 of the Revised Statutes of the United States, it clearly appears that it refers *only* to the crossing of *two or more veins with each other.* Not even the crossing of *leads or lodes* with each other (unless they are "veins"), or the crossing of *leads or lodes* with *veins;* or the crossing of either a *lead, lode, or vein,* with the lateral course of a surface location of a mining claim, or with the *side-lines* of a surface location or the crossing of one surface location by another surface location, but simply and only "when *two or more veins intersect or cross each other.*" There is nothing ambiguous in the language used, and it cannot be applied to anything but two *veins.*

While we do not agree with the learned court of Colorado in its application of section 2336 of the Revised Statutes of the United States to veins crossing each other on their strike or course, instead of to veins crossing each other on their dip, we do, however, agree with the learned court to this extent, that section 2336 applies only where two or more veins actually intersect or cross each other in some manner—either on the strike or the dip; that there must be an actual crossing of two veins; that section 2336 cannot apply where there

is but one vein. There cannot be an actual crossing of two veins in mining premises, unless two veins exist there. Under the pleadings the question of a crossing of two veins is not in issue.

Defendants' separate defense alleges that the Little Comet vein "has not intersected or crossed any other lode or vein," and defendants' three-hundred-foot level or drift is nearly two thousand feet long, from the "Miner's Dream" north, and more than half-way across the Black Eagle location, and not a word of testimony from which a crossing of mineral bodies can be presumed or inferred.

When defendants crossed the boundary-line of plaintiff's location, they were *prima facie* trespassers, and the burden of proving the contrary devolved upon them. *Cheeseman* v. *Shreve,* (Justice Brewer) 37. Fed. 36.

As to the necessity of defendants showing an actual crossing of two veins, as distinguished from a case with but a single vein, the court of Colorado in the case of *Omar* v. *Soper,* 11 Colo. 389, 7 Am. St. Rep. 246, 18 Pac. 445, says:—

"The attempt to justify the steps taken by the Verde claimants for the acquisition of title to the Golden Bell, by reference to the statutes relating to location of cross-lodes, is equally abortive. It is illogical; there being no analogy between the two classes of location, nor in the statute relating thereto. In the present case, there is a single vein; and under a fair construction of the statutes, federal and state, the portion thereof appropriated by the first discoverer is wholly withdrawn from interference or claim by any other citizen until some default is made. Such is not the law with reference to cross-lodes. In such case there are two lodes, which either cross each other or, approaching from different directions, unite at some point. In such cases the act of Congress (Rev. Stats., 2336) authorized the subsequent locator to cross or enter upon the territory of the claimant of the other lode. In this class of cases (cross-lodes) a claim to a portion of the previously appropriated territory may be initiated by authority of law, while it remains a valid subsisting claim; but no such authority exists as to the former class" (single vein).

In Copp's United States Mineral Lands (p. 470) a cross-vein is defined to be an "intersecting vein." Referring to

section 2336, it says, in speaking of rights under a patent to
a mining claim, "Provided, however, that where another lode
crosses, the ore at the space of intersection of the two lodes
belongs to the party who owns the prior location of the two,
whether patented first or second."

In *Morgenson* v. *Middlesex M. and M. Co.*, 11 Colo. 177,
17 Pac. 513, the defense was based upon the allegations that
the Silver Bell lode or vein, crossed the Butler lode or vein.
There were two distinct veins.

In *Coffee* v. *Emigh*, 15 Colo. 188, 25 Pac. 85, the court
says: "It is conceded that the territory of the Emancipation
lode crosses the territory of the Western Slope lode almost
at right angles, and that the veins therein are cross-veins."

In the Eureka case, 4 Saw. 324, Fed. Cas. No. 4548, Judge
Field, speaking of the rights conferred on the locator of a
mining claim under the act of 1872, says: "But these addi-
tional rights are granted subject to the limitation that in
following the veins, lodes, or ledges, the miner shall be con-
fined to such portions thereof as lie between vertical planes
drawn downward through the end-lines of his location, and a
further limitation upon his rights in cases where two or more
veins intersect or cross each other "

To the same effect, that there must be an actual crossing
of two veins, is section 185 of Weeks on Mineral Lands,
p. 247.

There is no conflict in the authorities that section 2336 of
the Revised Statutes of the United States can only be applied
to two veins actually crossing each other in some form or
manner.

This being the case, and defendants' answer alleging that
the vein in question is not crossed by and does not cross any
other vein in plaintiff's premises, when the court found that
the plaintiff was entitled to the surface ground of the Black
Eagle location, it determined all the material facts in the
case, and plaintiff should have had judgment as prayed for.
There being no crossing of two veins in the case, there is
nothing, even under the Colorado decisions, on which to base
a judgment for defendants. The portion of the judgment in
their favor is contrary to both the law and defendants' an-
swer. The question of crossing or intersecting of two veins is
pleaded out of the case, under any construction of section

2336, and, like the Verde claimants in *Omar* v. *Soper,* 11 Colo. 389, 7 Am. St. Rep. 246, 18 Pac. 445, defendants attempt to justify the steps taken by them "for the acquisition of plaintiff's vein by reference to section 2336 is equally abortive. It is illogical." The pleadings must be strictly construed against the party pleading. *Green* v. *Covillaud,* 10 Cal. 317, 70 Am. Dec. 725; *Bensley* v. *Mountain Lake W. Co.,* 13 Cal. 316, 73 Am. Dec. 575; *Charter* v. *San Francisco Sugar Ref. Co.,* 19 Cal. 257; *De Castro* v. *Clark,* 19 Cal. 16; *Garwood* v. *Hastings,* 38 Cal. 216.

The real foundation of the right they claim does not exist. And the court is asked to find a constructive vein, based on the imagination of counsel, and against his pleading and his testimony. If there was a crossing of veins in this case, it devolved upon defendants to allege and prove it, instead of alleging and proving the contrary. *Lee* v. *Stahl,* 13 Colo. 174, 22 Pac. 436.

Their claims and pleading must not be contradictory. After they denied and disproved any crossing of veins, they asked, and the court found, a constructive crossing of a real vein with the "court's vein." Where will the "court's vein" intersect the quartz vein? What is the width, strike, and dip of the "court's vein"? What amount of ore at space of intersection would plaintiff be allowed? Will not defendants claim the apex of the "court's vein" as the original discoverers?

"A finding of fact which negatives the existence of a fact admitted by the pleadings is a finding against the evidence, and judgment rendered thereon is erroneous." *Silverton* v. *Neary,* 59 Cal. 97.

In determining the question what is a cross-vein, or what sort of crossing of two veins Congress had in mind when the act known as the act of May 10, 1872, was passed, it is necessary to consider—

First—The authority to make a mining location and where it is found. Under the act of 1872 there is no authority for locating a lead, lode, or vein of ore except by locating the surface ground, including the top or apex of the lead, lode, or vein. Rev. Stats. U. S., sec. 2319. The surface so located is a mining claim upon veins or lodes of quartz or other rock in place. Rev. Stats. U. S., sec. 2320.

The miner locates the lead, lode, or vein only by locating the surface ground, including the apex of the lead, lode, or vein. *Eilers* v. *Boatman* 3 Utah, 167; *Gleeson* v. *Martin White Mining Co.,* 13 Nev. 457.

The "location," or the "claim," may be fifteen hundred feet by three hundred feet on each side of the vein or lode, and it is prohibited that mining regulations shall limit a claim so located to less than twenty-five feet on each side of the vein. Hence we see that the mining location authorized by the act of 1872 is the surface ground, and with the surface ground, marked with well-defined boundaries, is acquired the right to "all leads, lodes, or veins the tops or apexes of which are within said boundaries extended down vertically." *Belk* v. *Meagher,* 104 U. S. 280; *Gleeson* v. *Martin White Mining Co.,* 13 Nev. 457.

Section 2324 provides, among other things, that the location must be marked distinctly on the ground, so that its boundaries can be distinctly traced. The "claim located" must be described by reference to such natural objects or permanent monuments as will identify the claim.

Section 2325 of the Revised Statutes of the United States provides that "A patent for *any land claimed and located* for valuable deposits, may be obtained," etc. The field-notes of the surveyor shall show "accurately the boundaries of the claim," which shall be distinctly marked by monuments on the ground.

Therefore, a mining location is a location of surface ground containing mineral discovered, and the mineral can only be located by locating the surface containing it. The location and claim is a surface location and surface claim, the boundaries to which must be fixed and monumented on the ground as provided by law.

When this is done, section 2322 grants to the locators of such surface locations "the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and all veins, lodes, and ledges throughout their entire depths, the top or apex of which lies inside of such surface-lines extended downward vertically, although such veins, lodes, or ledges may so far depart from the perpendicular in their 'course downward' as to extend outside the vertical side-lines of such surface locations. . . . And nothing in this

section shall authorize the locator or possessor of a vein or lode which extends in its downward course beyond the vertical. lines of his claim to enter upon the surface of a claim owned or possessed by another." Rev. Stats. U. S., sec. 2322; *Gleeson* v. *Martin White Mining Co.,* 13 Nev. 457; *Blake* v. *Butte S. M. Co.,* 2 Utah 57; *The Eureka Case,* 4 Saw. 323, 324, Fed. Cas. No. 4548; *Eclipse etc. Mining Co.* v. *Spring,* 59 Cal. 304.

Section 2322 is clear and unambiguous. *Iron Silver Mining Co.* v. *Elgin Mining etc. Co.,* 118 U. S. 206, 6 Sup. Ct. Rep. 1177.

One of the earliest locations under the act of 1872 is decided in the case of *Gleeson* v. *Martin White Mining Co.,* 13 Nev. 454. At page 456, the court says: "It is true that the vein is the principal thing, and that the surface is but an incident thereto, but it is also true that the mining law has provided no means of locating a vein except by defining a surface claim, including the croppings, or point at which the vein is exposed, and the part of the vein located is determined by reference to the lines of the surface claim, but the location is of a piece of land including the vein." See *Golden Fleece Co.* v. *Cable Con. Co.,* 12 Nev. 329.

Again, in *Gleeson* v. *Martin White Mining Co.,* 13 Nev. 457, speaking of section 2320 of the Revised Statutes of the United States: "This section alone shows that it is a surface parallelogram not less than fifty feet in width that must be located, etc., as to the exclusive right of possession of all of surface included within the lines of their locations and of all veins." Rev. Stats. U. S., sec. 2322. "This is the only part of the act which grants the right to possess any lode, ledge, or vein."

If section 2322 is the only part of the act which grants the right to possess any ledge, lode, or vein, then no location can be made under section 2336, which simply refers to intersecting veins having apexes in adjoining claims, and having no conflict as to surface, and section 2336 must then be intended to determine some right separate from the surface claim, and which arises when the vein is followed on its downward course into the earth.

Section 2336 seems to contemplate that the point or space of intersection of "two or more veins" can be reached without any conflict or controversy between the locators of such veins, because it provides for nothing else than the determi-

nation of the rights of the respective parties at the *point*
or *space* of intersection as to the ore or mineral contained
therein and the right of way through such veins. This sec-
tion appears to be limited to such point.

It is certain that such point or space of intersection of two
or more veins will be under the surface of either the senior or
junior location. If this is the case, what authority exists in
the Mining Act of 1872 for the locator or owner of any mining
claim to pass from beneath his own surface ground and under
the surface of an adjoining mining claim. The only authority
is found in section 2322 of the Revised Statutes of the United
States, and then only *to follow a vein or lode on its dip.*
Again, on page 458, 13 Nev.: "Thus it appears that a location
of a vein must be made by taking up a piece of land to in-
clude it. No other means are provided, etc. No other view
can be taken where the language of the law is so plain as it is
in this instance." Again, on page 460: "Unless the miners
voluntarily restrict themselves by local regulations, a claim
may always be one thousand five hundred feet long and six
hundred feet wide. Let the discoverer be ever so unfortunate
in locating his claim, he cannot possibly get less than six hun-
dred feet of the vein, while under the old law the most he
could get was four hundred feet." Again, at page 461: "Be-
fore the statute [1872] he [the locator] could claim no more
than four hundred feet of the vein, and of that he was not
secure for a day. The moment he developed rich ore he was
beset by trespassers, and, in order to enjoin them from stealing
his property, was obliged to trace the vein between them and
the discovery point. He was harassed with litigation, and his
means often entirely consumed in the prosecution of work
not necessary for the development of his mine but essential
for the vindication of his title. . . . Under the new law this
source of vexation and expense is entirely swept away.
Within his surface-lines the discoverer of a vein is secure.
. . . Sound policy, therefore, concurs with the language of
the statute in sustaining our conclusion that a vein can only
be located by means of a surface claim."

The foregoing decision fully explains the instructions of
Judge Hallett in *Zollars* v. *Evans,* 5 Fed. 172, 2 McCrary 39,
4 Morr. Min. Rep. 402, and the Colorado court, in *Wolfly*
v. *Lebanon Mining Co.,* 4 Colo. 112, requiring plaintiff to

trace the mineral in the discovery shaft to the ground in controversy. It was under the act of 1866, when only a lode, and only one lode, could be located,—all else was open to location by others. Hence the necessity of connecting the discovery shaft by mineral with the premises in controversy. The act of 1872 did away with this. Within his surface-lines the owner of a valid location is secure.

The principle laid down by the supreme court of the United States in case of *Mining Co.* v. *Tarbet,* 98 U. S. 467-468, must control, to wit: As to this ledge or vein, the rule applying to the· end-lines of a location must be applied to our side-lines, which cross the vein in question at right angles; or, in other words, our side-lines become our end-lines, and our right to follow the vein on its "downward course" shall be limited on the strike of such vein by such vertical planes. *Iron Silver Mining Co.* v. *Elgin Mining Co.,* 118 U. S. 206-208, 6 Sup. Ct. Rep. 1177; *Argentine Mining Co.* v. *Terrible Mining Co.,* 122 U. S. 478-484, 7 Sup. Ct. Rep. 1356.

Defendants claim that this case falls under section 2336 of the Revised Statutes of the United States. They rely on the cases of *Branagan* v. *Dulaney,* 8 Colo. 408, 8 Pac. 669; *Lee* v. *Stahl,* 9 Colo. 208, 11 Pac. 77.

We have seen from these cases, on their own interpretation of what a crossing consists, that section 2336 applies only "when two or more veins intersect or cross each other," and not when a vein crosses a location or claim, or a gulch or something else. Defendants admit in their answer that the vein claimed by them simply crosses the Black Eagle claim or location, and that it does not cross or intersect any other vein or ledge within the Black Eagle premises; and on these facts the decisions of the United States supreme court are conclusive. *Mining Co.* v. *Tarbet,* 98 U. S. 463; *Eilers* v. *Boatman,* 3 Utah 167; *Iron Silver Mining Co.* v. *Elgin Silver Mining Co.,* 118 U. S. 206, 6 Sup. Ct. Rep. 1177; *Argentine Mining Co.* v. *Terrible Mining Co.,* 122 U. S. 478-484, 7 Sup. Ct. Rep. 1356.

What sort of crossing of two veins did Congress intend?

If the vein claimed by the defendants crossed another vein on its strike or course within the vertical boundary-lines of the Black Eagle mining claim, section 2336 would not apply (as was held by the supreme court of Colorado, in the case of

*Branagan* v. *Dulaney*), for the reason that under section 2322 of the Revised Statutes of the United States plaintiff, having a prior valid location, is entitled to "all veins, lodes, and ledges throughout their entire depth, the top or apex of which lies inside of such surface-lines extended downward vertically," etc.

If plaintiff had an east-and-west ledge or vein extending through its premises, and the vein claimed by defendants cut or crossed it on its strike or course, defendants could not follow the vein claimed by them across plaintiff's side-lines, for the apex of such vein would then be within plaintiff's vertical boundary-lines, and under section 2322 would belong to plaintiff. *Belk* v. *Meagher*, 104 U. S. 280; *Gleeson* v. *Martin White Mining Co.*, 13 Nev. 457; *Golden Fleece Co.* v. *Cable Con. Co.*, 12 Nev. 329; *Iron Silver Mining Co.* v. *Elgin Silver Mining Co.*, 118 U. S. 206, 6 Sup. Ct. Rep. 1177; *Jupiter Mining Co.* v. *Bodie Con. Co.*, 11 Fed. 676. The supreme court of Colorado, in the case of *Branagan* v. *Dulaney*, does not appear to have made any distinction between a case where "two or more intersect or cross each other" on their strike or course and a case "where two or more veins intersect or cross each other" on their "dip." The learned court says in that case regarding section 2322 and 2336: "The two sections appear to have been carelessly drafted, for they are certainly, to some extent, in conflict with each other." The court admits that to allow a subsequent location of any vein, the apex of which is within the vertical boundary-lines of a prior location, seems to be in conflict with a literal interpretation of section 2322, which Justice Field says "appears sufficiently clear on its face." The learned Colorado court further says: "But if such [the right to locate a vein crossing another on its strike] was the intention, we see no way out of the dilemma, except by the application of the arbitrary rule of construction. . . . As between conflicting statutes, the later in date will prevail, and as between conflicting sections of the same statute, the last in order of arrangement will control."

Thus the learned court gets out of a "dilemma" by practically repealing so much of the plain, unambiguous section 2322 as grants to the locators of mining claims "all other veins, lodes, or ledges throughout their entire depth, the apex of which lies inside of such surface-lines extended downward

vertically,'' providing such other vein or ledge crosses on its strike or course, any vein, or ledge, at any angle within the boundary-line of a prior location.

The only apology necessary for such conclusion is given in the language of the court,—''We see no other way out of the 'dilemma' except,'' etc.

That this was so is not surprising when, from the argument of counsel, it does not appear that the attention of the Colorado supreme court was called to the fact that ''two or more veins'' could ''intersect or cross each other'' on their dip, and not touch, intersect, or cross on their strike or course, and that it was to such sort of veins, crossing or intersecting in such manner only, that section 2336 was intended to apply, and that it does so apply to such sort of veins, without conflicting in any respect ''with a literal'' interpretation of section 2322.

To illustrate, let the following figures (page 46) represent two mining locations or veins running in opposite directions. If such locations could be permitted, as it is held in the Branagan case, it is plain that the older locator could not have all other veins, lodes, and ledges the top or apex of which lies within his surface location, because the apex of the cross-vein from A to B is inside the boundary-lines of the senior location, which is represented by the white surfaces respectively.

With such a construction of the statute, no mining claim, whether patented or not, would be free from the liability of the ruinous expense and delay of litigation caused by ''mine-jumpers,'' cross-locators, and blackmailers. A mining claim could never be free from the dangerous possibility of ''cross-location.'' *Gleeson* v. *Martin White Mining Co.*, 13 Nev. 442; *Golden Fleece Co.* v. *Cable Con. Co.*, 12 Nev. 329.

The price of extricating the learned court of Colorado from the ''dilemma'' is the casting of the titles of all mining premises into a much worse ''dilemma'' and changing a clear, simple mining act into an ambiguous and conflicting statute.

Apply section 2336 to another sort of veins, well known when the Mineral Act of 1872 was passed,—veins which cross or intersect each other, or unite,—not on their strike, but on their dip,—to veins which have parallel apexes, strike in the same direction, and, when developed or followed on their ''downward'' course, are found to ''dip'' in opposite direc-

tions (toward each other), and to intersect and cross each other, or to unite (possibly several hundred feet below the surface of the claim), as shown in the following figures I and II (page 47), and to which all the provisions of section 2336

clearly apply, and in no respect conflict with the provisions of section 2322. As to two veins meeting at a five-hundred-foot level and forming one vein, under section 2336, see *Champion*

FIG.I

FIG.II

*Mining Co.* v. *Consolidated Mining etc. Co.*, 75 Cal. 78, 16 Pac. 513; *Jupiter Mining Co.* v. *Bodie Con. Mining Co.*, 4 Morr. Min. Rep. 411, 11 Fed. 666, 7 Saw. 96.

A, B, C, D is a perpendicular plane through the end-line of the claim into the earth, showing the dip of the veins in figure I, until they "intersect and cross" on their "downward course" and in figure II until they "unite" on their "downward course."

From these figures it will be noticed that the croppings or apexes of the veins are parallel, that there is no conflict of locations or surface rights. Each locator is entitled to the "exclusive right of possession and enjoyment of all the surface included within the lines of his location, and of all veins, lodes, and ledges throughout their entire depth, the top or apex of which lies inside of such surface-lines."

When we apply section 2336 to "two or more veins" that "intersect or cross each other" on their dip only (as shown in figure I), and also to "two or more veins" that "unite" on their dip only (as shown in figure II), we see that in a literal construction of sections 2322 and 2336 there is no conflict between them.

There is no "dilemma" requiring "the application of an arbitrary rule of construction."

Each section "appears sufficiently clear on its face. There is no patent or latent ambiguity in it."

In applying section 2336 to figure I, we observe how clear is the language of the statute: "Priority of title shall govern, and such prior location shall be entitled to all ore or mineral contained within the space of intersection [I]; but the subsequent location shall have the right of way through the space of intersection [I] for the purpose of the convenient working of the mine; and when two or more veins unite [as in figure II at point H], the oldest or prior location shall take the vein below the point of union [H], including all the points of intersection."

We notice that the right of way is very necessary in following a vein on its dip when it crosses another vein, or is crossed by another vein on its dip. Without this privilege it would be impossible for the junior location to follow the vein below the point of intersection or crossing.

This construction is the plain common-sense construction,

and makes both sections in question perfectly harmonious, and acquits and relieves the "framers of these sections" of the "high charge" of the learned court of Colorado, of using words to "disguise" instead of to express "their meaning."

"It is always better," says Judge Sharswood, "to adhere to a plain common-sense interpretation of a statute." *Gyger's Estate,* 65 Pa. St. 312.

It is sustained by consideration of the necessity of its provisions when applied to veins crossing or intersecting each other on their dip only.

Besides, no other construction is consistent with the Mining Act as a whole, and it is a familiar rule in the construction of statutes that they must be so construed as to admit all parts of them to stand, if possible. 1 Bouvier's Institutes, p. 42, sec. 7; *Heydenfeldt* v. *Daney Gold etc. Co.,* 93 U. S. 638; *Cope* v. *Cope,* 137 U. S. 686, 11 Sup. Ct. Rep. 222; *McCool* v. *Smith,* 1 Black, 459; *Brown* v. *Lease,* 5 Hill, 221; *Ex parte Yerger,* 8 Wall. 105; *United States* v. *67 Packages,* 17 How. 85; *Red Rock* v. *Henry,* 106 U. S. 596, 1 Sup. Ct. Rep. 434; *Henderson's Tobacco,* 11 Wall. 652; *Venable* v. *Richards,* 105 U. S. 638; *Ex parte Crow Dog,* 109 U. S. 570, 3 Sup. Ct. Rep. 396; *Chew Hong* v. *United States,* 112 U. S. 549, 5 Sup. Ct. Rep. 255.

In the history of mining there does not appear to have been any litigation over veins which either cross or intersect each other on the "downward course" or dip, or veins which intersect and unite on their dip or downward course, excepting the case of *Champion Mining Co.* v. *Consolidated etc. Mining Co.,* 75 Cal. 78, 16 Pac. 513, and the instructions of Judge Sawyer in the case of *Jupiter Mining Co.* v. *Bodie Con. Mining Co.,* 4 Morr. Min. Rep. 411, 11 Fed. 766, 7 Sawy. 96. To this sort of formation section 2336 applies so plainly and clearly there could not well be any excuse for a controversy.

Under the law of 1872, the locator is secure within his surface-lines, and does not have to trace his point of discovery by mineral to the point of the jumper, cross-locator, or the secret miner on the three-hundred-foot level.

If this were not so, how could the Mining Act be applied to this mining district, containing, as shown by the evidence, a few large fissures, and the intermediate and adjacent country, consisting of lime rock, embracing all sorts of irregu-

lar forms of ore deposits, chambers, pockets, connected or disconnected by crevices, seams, stringers of ore, or stained rock, feeders, offshoots, or spurs? Shall the law be construed, unnecessarily, so as to require a locator of a mine to show a ledge from one end of his location to the other, before he can eject a trespasser from the ground he has located? If so, how is the prospector to acquire exclusive right of possession to mineral in a limestone formation containing irregular and disconnected deposits or ledges of ore?

The effect of a location like the Black Eagle claim is fully determined by the decision of the United States supreme court in *Mining Co.* v. *Tarbet,* 98 U. S. 467.

William Herring, for Appellees.

The plaintiff is bound by the lines of its surface claim in favor of the subsequent locator.

In the Golden Fleece case, 15 Nev. 450, the testimony showed that "When the Golden Fleece was originally located the vein was supposed to run northwest and southeast, and that the surface claim was so marked out on the ground; that subsequently, and long after the Leonard claim had been located, according to its present boundaries, and even after the official survey made for the purpose of the application for a patent, the plaintiff, discovering that the vein ran northeast and southwest, swung its claim around almost at right angles to its former position," etc.

In view of this attempted swinging by plaintiff, and referring to the United States law, the court said: "Under that law it cannot be doubted that it is bounded by the lines of its surface claim in favor of a subsequent locator." And further, that "those lines are fixed by the monuments on the ground, and they cannot be changed so as to interfere with other claims subsequently located."

In this case the court also said: "The requirements of the law, as to what the record shall show, are evidently designed to fix the *locus* of the claim, in order to prevent floating."

"Marking the boundaries of the surface claim, as required by statute, is one of the first steps toward a location. It serves a double purpose. It operates to determine the right of the claimant as between himself and the general government, and to notify third persons of his rights. Another, seeking the

benefits of the law, going upon the ground, is distinctly noti-
fied of the appropriation, and can ascertain its boundaries.
He may thus make his own location with certainty, knowing
that the boundaries of the other cannot be changed so as to
encroach on ground duly appropriated. prior to the change.
The prevention of frauds by swinging or floating is one of the
purposes served." *Pollard* v. *Shively,* 2 Morr. Min. Rep. 229.
In the supreme court of the United States, Mr. Justice Field
said: "The question is therefore whether the location of a
vein or lode as running in a certain direction but not marked
on the surface for years, nor developed, but simply indicated
by a notice, will be allowed to prevail against a claim subse-
quently located by another party on ground different from
that thus indicated, after the latter has been developed by
years of labor and large expenditure, without objection by
the first locators, because subsequent explorations by them
disclose the fact that their veins run in a different direction
from what they supposed, and in their true course cover the
subsequent claim.  We do not think that the first claimants
under these circumstances can appropriate the second claim.
It is true the locators of the Omaha claim intended to take
the vein or lode and were ignorant of its true direction.  But
it was incumbent upon them to make explorations and ascer-
tain its true course, and indicate it in some public and visible
manner, so that others might not be excluded from explora-
tions on adjacent ground or be deprived of the benefit of their
labor.   *O'Reilly* v. *Campbell,* 116 U. S. 419, 6 Sup. Ct.
Rep. 421.

The locator cannot change his lines to the injury of an in-
tervener.   *Crœsus Co.* v. *Colorado Co.,* 1 W. C. Rep. 451,
cited 9 Morr. 560.

In the case of *King* v. *Amy & Silversmith Con. Mining Co.,*
24 Pac. 203, the court says: "The United States cases cited
by the counsel are: *Mining Co.* v. *Tarbet,* 98 U. S. 463; *Iron
Silver Mining Co.* v. *Elgin Mining Co.,* 118 U. S. 196, 6 Sup.
Ct. Rep. 1177; *Argentine Mining Co.* v. *Terrible Mining Co.,*
122 U. S. 478, 7 Sup. Ct. Rep. 1356.  If there be one legal
principle that is announced with more clearness and fre-
quency than all others throughout all these cases, it is, that
'the boundary planes shall be definitely determined by the
lines of the surface location, and that they shall not be subject

to perpetual readjustment according to subterranean developments made by mine workings.' " *The Elgin Case,* 118 U. S. 207, 6 Sup. Ct. Rep. 1177.

Justice Field says in the Elgin case, 118 U. S. 207, 6 Sup. Ct. Rep. 1177: "If the first locator will not, or cannot, make the explorations necessary to ascertain the true course of the vein, and draws his end-lines ignorantly, he must bear the consequences. . . . Junior locators will not be prejudiced thereby, though subsequent explorations may show that he erred in his location."

"The miner is left free to make his choice of location as he sees fit, and ample opportunity is given him to determine the situation of his lode or vein. If he makes this choice without sufficient explorations to guide him in making the location, the blame rests upon himself." *McCormick* v. *Varnes,* 9 Morr. 512.

Has it not been conceded that the original locators of the Black Eagle claim had "ample opportunity" to determine the course of their lode, providing there was one within their claim, and make or amend their location notice accordingly, before the subsequent location of the Little Comet? The Black Eagle was located January 1, 1882. Its location notice was recorded January 3, 1882, and has never been altered or amended.

Defendants' claim, the Little Comet Mine, was not located until January 1, 1885. The location notice of the Black Eagle purported to claim a lode extending in a certain direction, and this location notice had been of record for three years, unaltered and unamended, at the time the defendants' Little Comet was located.

Were the original locators of the Little Comet to abstain from locating a claim on a lode known to extend in an entirely different direction from that indicated in the Black Eagle notice?

True, if the Black Eagle had a lode as indicated by its location notice, the two lodes were ultimately bound to intersect or cross. But as Congress had seen fit to protect the right of the subsequent locator to his cross-lode, when such contingency should arise (Rev. Stats. U. S., sec. 2336), the mere fact that the ore within the space of intersection of the two lodes would belong to the senior location would hardly

be sufficient to deter the locators of the Little Comet from making their location.

Whatever rights the plaintiff may claim under section 2322 of the Revised Statutes of the United States must yield to the right of defendants to their cross-lode, which they claim they are lawfully entitled to, under section 2336; for, "as between conflicting statutes, the latest in date will prevail, and as between conflicting sections of the same statute, the last in order of arrangement will control." *Branagan* v. *Dulaney,* 8 Colo. 408, 8 Pac. 669; *Hall* v. *Equator M. and S. Co.,* Morr. Min. Rights, 3d ed. 232; *Lee* v. *Stahl,* 13 Colo. 174, 22 Pac. 436; *Coffee* v. *Emigh,* 15 Colo. 184, 25 Pac. 83.

"If a conflict exists between two statutes or provisions, the earlier in enactment or position is repealed by the later. *Leges posteriores priores contrarias abrogant.* Where there is an irreconcilable conflict between different sections or parts of the same statute the last words stand, and those which are in conflict with them, so far as there is a conflict, are repealed; that is, the part of a statute later in position in the same act or section is deemed later in time, and prevails over repugnant parts occurring before, though enacted and to take effect at the same time. This rule is applicable where no reasonable construction will harmonize the parts. It is presumed that each part of a statute is intended to coact with each other part; that no part is intended to antagonize the general purpose of the enactment." Sutherland on Statutory Construction, sec. 160, pp. 214, 215.

"When a junior location crosses a senior location, and the veins therein are cross-veins, the junior locator is entitled to all the ore found on his vein within the side-lines of the senior location, except at the intersection of the two veins. In such a case a junior locator has a right of way for the purpose of excavating and taking away the mineral contained in the cross-vein." *Lee* v. *Stahl,* 9 Colo. 208, 11 Pac. 77; *Branagan* v. *Dulaney,* 8 Colo. 408, 8 Pac. 669; *Morgenson* v. *Middlesex etc. Co.,* 11 Colo. 177, 17 Pac. 513; *Coffee* v. *Emigh,* 15 Colo. 184, 25 Pac. 83; *Omar* v. *Soper,* 11 Colo. 389, 7 Am. St. Rep. 246, 18 Pac. 443; *Hall* v. *Equator,* Morr. Min. Rights, 282.

"And upon a grant of the cross-vein itself, such right of way would pass as an incident of the grant." *Branagan* v.

*Dulaney,* 8 Colo. 408, 8 Pac. 639, aff. *Lee* v. *Stahl,* 9 Colo. 210, 11 Pac. 77; *Morgenson* v. *Middlesex etc. Co.,* 11 Colo. 179, 17 Pac. 513; *Farmers' etc. Co.* v. *Southworth,* 13 Colo. 117, 21 Pac. 1028.

And in commenting upon the additional rights granted to the miner by the act of 1872, Judge Field, in the celebrated Eureka case, said: "But these additional rights are granted subject to the limitation that in following the veins, lodes, or ledges, the miner shall be confined to such portions thereof as lie between vertical planes drawn downward through the end-lines of his location, and a further limitation upon his right in cases where two or more veins intersect or cross each other."

"The act [of 1872] in terms annexes these conditions to the possession not only of claims subsequently located, but to those previously located." *The Eureka Case,* 4 Saw. 324, Fed. Cas. No. 4548.

Referring to section 2336 of the Revised Statutes: "The construction which has been given to this part of the law is, that a party has a right to a patent for the number of feet along his lode or vein to which he has the local title, upon full compliance with the law and instructions; provided, however, that where another lode crosses, the ore at the space of intersection of the two lodes belongs to the party who owns the prior location of the two, whether patented first or second.

"The law clearly refers to cross-lodes, and provides that the ore at the crossing of the two lodes shall belong to the first valid location, and hence, where a patent issues for a mining claim which crosses one already patented, the surface ground in conflict is excepted from the second patent, but the subsequent patentee has the right under his patent to the lode for the distance patented, with the proviso hereinbefore referred to,—viz., that the ore at the space of intersection of the cross-lodes shall belong to the prior location." Weeks on Mineral Lands, sec. 185, p. 247; Copp's U S. Mineral Lands, 470.

KIBBEY, J.—This action grew out of the assertion and exercise by the appellees (defendants below) of a disputed right to extract and appropriate silver ore from a lode lying within the boundary limits of the mining claim known as the "Black Eagle," owned by the appellant. The facts disclosed

by the record, so far as they are pertinent to the question
presented to this court, are, that on the first day of January,
1882, the Black Eagle mining location was made; that since
that time the claimants of that mine have performed all the
statutory requirements essential to constitute it a valid min-
ing claim.   The Black Eagle claim lies in a northeasterly
and southeasterly direction, and is approximately a parallelo-
gram —— feet in length and —— feet in width.   Appellant
is the owner of the claim by several mesne conveyances from
the original locators.   Three years after the location of the
Black Eagle Mine the Little ·Comet Mine was located, and
the statutory requirements to constitute that a valid mining
claim have been complied with.   The appellees are the own-
ers of the Little Comet Mine.   The Little Comet claim inter-
sects, and partially overlies the Black Eagle claim, so that a
part of the Black Eagle and of the Little Comet lie within
common boundaries.   A distinct, well-defined lode of silver
ore has been found and traced, by means of a tunnel driven
on the lode, following its axis, for a distance of twelve hun-
dred or fifteen hundred feet from a point within the bound-
aries of either claim to a point two hundred and eighty-five
feet within the boundaries of the Black Eagle claim, and
within the side-lines of the Little Comet.   The entrance to
the tunnel is at the three-hundred-foot level, on the Big
Comet Mine, owned and operated by the appellees, and of
which the Little Comet is practically a northern extension.
The apex of the lode, so far as it has been disclosed by de-
velopment, is within the side-lines of the Big Comet, as well
as of its extension,—the Little Comet,—and about two hun-
dred and eighty-five feet of its extent, as developed, is also
within the surface boundaries of the Black Eagle.   The dia-
gram on the following page will denote the relative positions
of the several claims, and of the workings thereon.

The appellees have driven their tunnel into the ground
within the Black Eagle claim, as denoted on the diagram,
appropriated the ore found therein, and claim the owner-
ship thereof, and threaten to continue to extract and ap-
propriate the ore therefrom.   The appellant claims the
ownership of the ore, and the right to mine it, under the
provisions of section 2322 of the Revised Statutes of
the United States.   Appellees claim the ownership of the ore,

except that at the space of actual intersection of the lodes, under the provisions of section 2336 of the Revised Statutes of the United States, asserting that the lode on the Little Comet crosses or intersects a lode on the Black Eagle. In fact, no intersecting lode has been encountered; but the court finds that there is a lode on the Black Eagle which, inferentially, the lode upon which the appellees have driven their tunnel will, if further exploited, be found to intersect.

The question presented to us for our consideration has not been the subject of former adjudication in this territory and elsewhere, we believe, except in the state of Colorado. Because of the novelty of the question here, and the fact that we arrive at a conclusion at variance with that of the Colorado court, we feel justified in stating more at length the reason for our conclusion than we should otherwise do.

Our mining laws have grown from, and been suggested by, the practice of the miners themselves. As from time to time conditions changed, the miners framed rules applicable thereto. These rules had no reference in the first instance to the acquisition of the title, either to the mineral or to the land in which it was found. The title was, admittedly, at least in the western states, in the United States. But that title was ignored by the early miners, and the invasion of the rights of the United States by the miners in entering upon its lands and extracting therefrom and appropriating the valuable minerals, was not resented by that government. The rules of

the miners referred almost exclusively to the ascertainment and enforcement of their individual claims as among themselves. At first, and until 1872, the substantial thing claimed by the miner was the lode-bearing mineral. He cared nothing for the soil or land itself, except as it was a necessary adjunct to the process of mining. His only claim to the surface was, that he might have a place whereon to erect his mill, his hoisting-works, and, if he desired, to live, and to deposit the débris resulting from the process of mining. His only claim to the ground below the surface, outside the limits of his lode, was to its use for reaching and extracting the ore from his lode by tunneling, drifting, etc., or to obtain the water necessary for carrying on his mining operations. His right to extract mineral was confined to the limits of the lode that he had discovered and located. The right was dependent upon discovery, and the observance of, and compliance with, certain rules prescribed by the miners themselves or by local statute, designed chiefly to give publicity and certainty to the fact and extent of his claim, and to afford evidence of his good faith in the location. These rules almost from the beginning limited the extent of the lode which might be claimed. It was provided that the miner should not have more than a designated number of feet of the lode he might discover and locate, to be measured along the course of the lode itself. With the lode he acquired the right to all its dips, angles, spurs, and variations; but he acquired no right to any cross or intersecting lode, or to any parallel lode. His claim was to the lode which he had discovered and located, staked, monumented, and exploited in the manner prescribed by the miners' rules and the local statutes, and to all its dips, angles, spurs, and variations which were a substantial part of it. So long as he was able to establish that any particular ore body was a part of the lode that he had legally located, and was within the longitudinal limits of his claim, he established his right to that ore. To isolate his lode from all others was to define his claim. It is well known that lodes are not uniform in their course, their dip, or in any of their dimensions, nor in the character of the ore that they carry; that in their course, and upon their dip, they may divide, and may or may not reunite; that there may be a principal, or, as miners sometimes denominate it, a "mother," lode; diverging from it are

spurs, offshoots, or branch lodes; that the lodes are subject to faults or displacement of their fractured ends, breaking the continuity of the lode; that the lode may be crossed on its strike or course, or upon its dip, by other and distinct lodes of similar or different character; that a lode may in parts of its course be overlain by an adjacent lode; that a lode may at any part of its strike, or upon its dip, "pinch out" or vanish. These incidental characteristics of ore lodes cannot be determined except by complete exploration of the lode itself. Indeed, not all of them can be ascertained until after the complete removal of all the lode material, leaving only the matrix. The miner cannot know what is in advance of his drill in any direction. He cannot often, with any probability of fulfillment, predict.

The first act of Congress recognizing the rights of miners was in 1866, which, among other things, provided for patenting to persons who claimed a lode of quartz, or other rock in place, bearing gold, silver, etc. Here Congress recognized the customs and rules of the miners, whereby the claim was to the lode, as distinguished from the land itself. It was inevitable from this condition of things that disputes should arise among rival claimants to mineral-bearing lodes. The question of priority of discovery and notice and of the extent of the claim were of easy solution. The question of the identity of the lode presented almost insurmountable obstacles. True, lawsuits were instituted and decided. Courts found that ore found in one place was from the same lode as that discovered, maybe, one thousand feet away. Mining experts and geologists projected into the realm of fact their theories and their guesses. This was the best that could be done. Certainty was impossible. An approach to it was improbable. Mining rights were most precarious. The miner's right to that part of the lode at his discovery shaft was subject to defeasance by establishing that he was upon but a spur of his neighbor's lode and not on his lode. These conditions were provocative of disputes and of consequent litigation. They afforded a premium to the unscrupulous to institute lawsuits, for in them the chances of success for the unjust and the just were about equal. It was but a lottery.

In 1872 Congress enacted a new mining law. We may surely assume that Congress well knew of the evils arising

from the application of the old rule relative to the acquisition of mining rights. By section 2319 of the Revised Statutes of the United States, it is provided "that all valuable mineral deposits in lands belonging to the United States . . . are hereby declared to be free and open to exploration and purchase; and the lands in which they are found, to occupation and purchase." For the first time we here find the land in which mineral is found to be a substantial, integral part of the claim. Section 2322 gives not the lode alone, but all lodes, veins, and ledges, throughout their entire depth, the top or apex of which lies inside of the surface lines of the claim extended downward vertically; and as lodes may dip, so that, when followed, they may be found to extend beyond the boundaries of the claim, Congress further provides that they may nevertheless be followed, but that the locator shall be entitled only to such part thereof as lies between vertical planes drawn downward through the end-lines of the claim. In other words, Congress has said to the miners: "Comply with the requirements that we impose, and the government of the United States will grant absolutely to you a piece of the earth, bounded at the surface by straight lines distinctly marked, and by planes extending through those lines to the center of the earth; and you shall have all lodes of mineral-bearing rock whose apex is within those boundaries." This is simple, plain, and the miner's rights are thereunder easy of ascertainment. He does not have to trouble with dips, spurs, and angles. If he or another makes dozens of distinct discoveries of one lode, or of a dozen different lodes, which have their apex within his boundaries, he is not concerned about their identity. No one can question his right to them. They are all within his slice of the earth, and by the express terms of the statute they are his. In two instances contemplated by the statute he may pursue a lode beyond the limits of his claim, or the ground within the boundaries of his claim may be invaded by an adjacent proprietor: First, when the lode, having its apex within the boundaries of his claim, shall dip beyond them (but even in that event he is limited by the planes passing through the end-lines of his claim); and second, when a locator shall have located a lode prior to the tenth day of May, 1872, under the mining laws then in force, and shall, as against a subsequent and overlapping claim, have

saved his right to his lode in the manner prescribed in the act of 1872. In the latter case the prior locator may follow his lode upon its strike or dip into other ground than his own. It will immediately suggest itself to a legislator that where a miner may follow a lode outside of his boundaries he might encounter adverse rights in an adjoining claim. His lode might intersect a lode of an adjoining claim or it might unite with it. With this in mind, Congress enacted section 2336, whereby provision is made for the determination of what would otherwise be conflicting claims. It provides that at the space of the intersection of such lodes the oldest locator shall have the ore, and that the junior locator shall have a right of way through that space, to pursue and work his lode; that if there be a union of two lodes the senior locator shall take the ore at the space of intersection or union and all of the lode below the point of union. These two sections, so construed, completely define and make easy of ascertainment the rights of the miner. They are easily applicable to any conditions that may arise, and eliminate from consideration all perplexing questions that attend an attempt to identify, define, and isolate lodes. But we are asked to put a different construction upon section 2336,—a construction that admittedly renders that section repugnant to section 2322. We are asked to go still further, and hold that section 2336, to the extent of such repugnancy, repeals by implication the provisions of section 2322. Counsel for the appellees have argued the question with great earnestness and ingenuity.

Preliminary, however, to the discussion of that question, we wish to dispose of another. It was argued during the presentation of this case by the appellees that a mining claim, to be valid, must be located along the course of a lode; that the statute contemplates that it shall be so done. The statute, as we understand it, only intends to prescribe the limit of exent along the course of the lode that the locator may claim, not that he shall locate so that the greatest dimension of his claim shall coincide with the course of the lode. It is provided that the extreme extent along the lode shall not exceed fifteen hundred feet. It may be less. And if the miner in making his location should mistake the direction of the lode upon which he locates, and accordingly make the extreme dimensions of his claim in a direction other than

that of the lode, that fact does not invalidate his claim, but only operates to diminish the extent of the lode that he might have included within the boundaries of his claim. Of course, Congress expected that the miner would avail himself of the privilege accorded him and locate along the course of the lode, but it does not require him to do so. The only result of not so locating is, that the locator gets less in extent of the lode than he otherwise would have located, and that if the side-lines instead of the end-lines cross the course of the lode, in order to define the locator's rights to pursue the lode on its dip the side-lines will be treated as end-lines. *Mining Co.* v. *Tarbet,* 98 U. S. 463.

Section 2322 of the Revised Statutes of the United States is as follows: ''Sec. 2322. The locators of all mining locations heretofore made, or which shall hereafter be made, on any mineral vein, lode, or ledge, situated on the public domain, their heirs and assigns, where no adverse claim exists on the 10th day of May, 1872, so long as they comply with the laws of the United States, and with the state, territorial, and local regulations not in conflict with the laws of the United States, governing their possessory title, shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and all veins, lodes, and ledges throughout their entire depth, the top or apex of which lies inside of such surface lines extended down vertically, although such veins, lodes, or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side-lines of such surface location. But their right of possession to such outside parts of such veins or ledges shall be confined to such portions thereof as lie between vertical planes drawn downward, as above described, through the end-lines of their locations, so continued in their own direction that such planes will intersect such exterior part of such veins or ledges. And nothing in this section shall authorize the locator or possessor of a vein or lode which extends, in its downward course, beyond the vertical lines of his claim, to enter upon the surface of a claim owned or possessed by another.'' And section 2336 is as follows: ''Sec. 2336. Where two or more veins intersect or cross each other, priority of title shall govern, and such prior location shall be entitled to all ore or mineral contained within the space of

intersection, but the subsequent location shall have the right of way through the space of intersection for the purposes of convenient working of the mine; and, where two or more veins unite, the oldest or prior location shall take the vein below the point of union, including all the space of intersection.''

The appellees claim that they discovered a lode of ore subsequent in point of time to the location of the appellant's mine,—the Black Eagle,—the discovery being at a point on the lode south and outside of the surface limits of the Black Eagle claim; that they have traced that lode by tunneling within its walls a considerable distance into the ground of the Black Eagle; that that which is inferentially the same lode has been discovered at a point north of the Black Eagle claim; that these points of discovery are on the general strike of the lode, which is traced from a point from the Miner's Dream claim northwardly through the length of the Big Comet, and on the same general course into the Little Comet and the Black Eagle, to the point of dispute. There seems to be no reasonable doubt of the identity of the lode on its course from the Miner's Dream to the face of the tunnel in the ground of the Black Eagle. The appellees in their answer allege that up to that time this lode had not encountered or crossed any other lode or vein, but they urge that inasmuch as the court below finds that the Black Eagle is a valid mining claim, it must have found, as a condition precedent to the validity of the claim, the fact that there was upon that claim a lode, vein, or ledge containing quartz or other rock bearing mineral. There is in the record evidence that discoveries of ore were made in several places on the Black Eagle claim, and that if a line were drawn connecting these several points of discovery, that line, if extended in the same general course, would cross the supposed course of what for convenience of expression we may call the Little Comet lode. The fact of an actual crossing or intersection of two lodes is not testified to, admitted, or proved. Appellees contend that the inference of the facts testified to is aided by the presumption that the Black Eagle claim was located longitudinally along the course of a lode, and that therefrom it must be inferred that there is an actual intersection somewhere within the limits of both the Black Eagle and the Little Comet of the Little Comet

lode and some lode in the Black Eagle; and upon the existence
of the fact of such a crossing the appellees claim that section
2336 gives them the right to all the ore in the Little Comet
lode within the boundaries of that claim, whether within the
boundaries of the Black Eagle or not, except the ore within
the "space of intersection." We cannot doubt that the
expression, the "ore within the space of intersection," means
that body of ore bounded by the foot- and hanging-walls of
one lode extended in a general course of that lode and the
foot- and the hanging-walls of the intersecting lode extended
upon its general course. It is only to this body of ore, lim-
ited as we have noted, that section 2336 relates. In one in-
stance the body of ore is given to the prior locator, and in the
other a right of way is given through that body of ore to the
junior locator. It cannot relate to ore outside of the space of
intersection. It does not do so in terms, and we do not feel
justified to extend it by construction. By section 2322 ·we
think it clear that a locator cannot go outside of any of his
lines on the strike or course of any lode, except under rights
acquired by him prior to the enactment of 1872, and saved
to him under the provisions of that act. That doctrine is
clearly enunciated in the Flagstaff case, before cited. The
right of the miner to go beyond the limits of his claim on the
strike of a lode can only be given by the construction of sec-
tion 2336 claimed by the appellees; and that is, that that sec-
tion was designed to give a new right where lodes in fact
cross, and not to define and settle prior existing rights at the
space of intersection. In other words, that if a lode on a
junior location intersects on its strike within the boundaries
of a senior location a lode on such senior location, then the
junior locator may . take all the ore in the first-mentioned
lode within the boundaries of both the senior and junior loca-
tion, except at the space of intersection, notwithstanding that
section 2322 limits the locator to his own boundaries, except
when pursuing a lode on its dip, and that to this extent sec-
tion 2336 repeals section 2322. There need be here no dis-
cussion of appellees' proposition that, as between conflicting
sections of the same statute, the last in the order of arrange-
ment shall prevail. In this connection we may only add that
Mr. Sutherland, in his work on Statutory Construction, cited
by the appellees, in the same section wherein he announces

this canon of statutory construction, says: "This rule is applicable where no reasonable construction will harmonize the parts. It is presumed that each part of a statute is intended to coact with every other part; that no part is intended to antagonize the general purpose of the enactment." Sutherland on Statutory Construction, sec. 160. Do sections 2322 and 2336 conflict? Can they be harmonized by reasonable construction? We have indicated our construction of the two sections. They are thereby in complete harmony, and coact for the accomplishment of what seems to us to be the very purpose of the statute,—i. e. the establishment of a rule for the easy definition of miners' rights, and the elimination therefrom of the uncertainties of the old rule; the substitute for the lode claim, which must always be uncertain and provocative of disputes in its practicable application, of the easily and well-defined segment of the earth, with its mineral contents. Appellees assert that when a junior location crosses a prior location, and the lodes therein are cross-lodes, the junior locator is entitled to all the ore found in his lode within the side-lines of the senior location, except at the space of the intersection of the two lodes. In such case the prior locator has the right of way for the purpose of excavating and taking away the mineral in the cross-vein. These propositions contain two elements that are not contemplated, at least in terms, by the statute. The statute does not in any place contemplate a crossing of locations. It does not say so. To so construe it is to say that "cross-lodes" or "veins" mean cross-locations; and if we are to adopt that meaning,—a plain distortion of the statute,—we must be consistent, and read section 2336 with the words "cross-locations" wherever the words "cross-lodes" appear. The words used mean one or the other, or both, but certainly not the first only, or the second only, to the exclusion of the other, to suit convenience. We do not wish to be understood to accede to the proposition that "lode, vein, or ledge" means other than "lode, vein, and ledge." It is the grossest brutality of statutory construction to attempt to construe those words to mean "locations" or "claims." But it seems to us that appellees are no better off even with that substitution. Reading that section as if the word was "location" instead of "vein or lode," even then appellees, not having the prior location, would have no right to

any ore within the space of intersection of the claims. In that event the space of intersection is the space bounded by the side-lines of the Black Eagle on the north and south, and by the side-lines of the Little Comet on the east and west; and by section 2336 the ore therein belongs to the oldest locator,—i. e. the appellant, or owner of the Black Eagle. At most, the appellees could have a right of way only through this space of intersection whereby to reach and extract their ore north of, and beyond, the Black Eagle's north side-line. The first case in which there is a construction of section 2336 to which our attention has been called is the case of *Hall* v. *Mining Co.*, Morr. Min. Rights, at page 282. The opinion was delivered by Hallett, United States district judge for the district of Colorado. The great reputation of Judge Hallett for erudition, especially in questions involving mining rights, gives rise to much diffidence upon our part in attempting to criticise his decision in that case. The decision in that case was upon a motion to dissolve an injunction. It seems that the Colorado Central lode and the Equator lode, in the Griffith Mining District, in Colorado, were both patented lodes. The patent for the Central lode is senior to that of the Equator, but its location is junior to that of the Equator, the location of the Equator lode having been made in 1866. The patents to each were in 1875. Each location was fifty feet in width, and one was fourteen hundred and the other fifteen hundred feet in length. Their general course was east and west, the course of one departing about twelve degrees from that of the other. The east end of the Central overlapped the west end of the Equator in such a way as to leave a small part of each projecting beyond the north side-lines of the other. It further appears "that," in the language of Judge Hallett, "these locations were made as and for different lodes, crossing each other with an acute angle of about twelve degrees, and each extending beyond the lines of the other for a distance of more that two hundred feet." The dispute in the case arose over the ownership of ore in a body of ore found in or under the east end of the Central, and thence extending westward to and across the intersection with the Equator location. Premising that any priorities acquired by private discoveries or locations are merged in the patents, and that priority of right thereafter depends on priority of patent, Judge Hallett pro-

Arizona 4—5

ceeds to the consideration of section 2322 and 2336. He says: "The general language of section 2322 seems to comprehend all lodes having their tops and apexes in the territory described by the patent, whether the same lie transversely or collaterally to the principal lode on which the location was made. Considered by itself, such would be the meaning and effect of that section. But there is another section relating to cross-lodes which is of different import." He then quotes section 2336, and proceeds: "It will be observed that by this section the first locator and patentee of a lode gets only such part of cross and intersecting veins as lie within the space of intersection, to the exclusion of the remainder of such lode and veins lying within his own territory." And this is all that Judge Hallett says upon the subject, except to say that therefore section 2336 repeals *pro tanto* section 2322, and deduces the conclusion that the subsequent patentee is entitled to all the intersecting lode, except at the space of intersection. If this is the construction of section 2336, then a locator of a mining claim does not become the owner of all the lodes, veins, and ledges in his segment of earth, whether there be a prior locator and patentee or not, for at the time of patent the first patentee is the only patentee. This seems a strange situation to us. It is a relegation of the whole system of acquirement of mining rights to the methods prevailing prior to 1872. The miners' rights are again made to depend on the existence of facts the establishment of which cannot be made until after the time of the enjoyment of the right is irrevocably gone. How can the miner know that the lode upon which he locates is not a cross-lode,—that is, a cross-lode in the sense Judge Hallett uses that term? It seems to us that Judge Hallett overlooked the fact that section 2336 referred to no rights whatever in cross-lodes, except at the point of intersection. It does not in terms, and we certainly think cannot by implication, relate to rights in any lode except at the space of intersection. Congress only contemplates that if A has a valid right to the ore in a given lode, and B the ore in another, and if those lodes happen at some point to intersect, then, by section 2336, their rights within the space of intersection are to be defined. The right of A to the ore in his lode, and of B in his, were not, and are not, in any wise dependent upon the fact of crossing. The learned judge seems

in one instance to designate by the term "cross-lode" a lode whose general course is along the shortest dimension of the claim, while in the other instance a lode which in fact crosses another lode. Every lode may in fact be both. If by "cross-lode" is meant a lode crossing a claim, what of a lode that is as nearly transverse as longitudinal? What of a lode that is partly transverse and partly longitudinal? If by "cross-lode" is meant a lode crossing another lode, where must the intersection be,—within or without the claim of one or the other, or of both of the claims of the contestants? How can it be known that in the latter sense a lode is a cross-lode until the fact of crossing is substantiated. May a man go upon a claim, work out the ore, and then find that his lode was a "cross-lode," and he thereby be made a trespasser *ab initio,* even as against a subsequent locator? The logical result of such a construction but confounds the confusion sought to be avoided.

We are next referred to the case of *Branagan* v. *Dulaney,* 8 Colo. 409, 8 Pac. 669. That case simply follows *Hall* v. *Mining Co., supra,* decided by Judge Hallett, and is subject to the same criticism. The next case in chronological order is *Lee* v. *Stahl,* 9 Colo. 208, 11 Pac. 77. The court there simply follows the Equator case and *Branagan* v. *Dulaney,* without comment; and so with the other Colorado cases cited. We are cited to some decisions by the department of the interior. Without discussing them, we can only say that so far as they attempt to construe section 2336 as giving rights in any lode outside of the space of intersection with another lode, each of the intersecting lodes being owned by different persons, we cannot agree with them.

It was argued at the trial of this case that as a matter of fact lodes, veins, and ledges do not intersect, except upon their strike; that an instance of a crossing upon the dip of two veins was unknown, and that therefore section 2336 must refer to the crossing of lodes on their strike; that Congress would not legislate to define rights dependent upon a condition that can never happen. If it be true that an instance of two lodes intersecting upon their dip is unknown, that fact is only evidence, and we think very slight evidence, that they may not do so. It is a complete answer to that that lodes can cross on their dip. But we think it unimportant whether they

can or not. Congress had in mind at the time of the enact-
ment of the law of 1872 that, as mining rights then stood, A's
lode might legally cross B's lode on the strike, and whether
on the dip or not makes no difference; and section 2336 was
designed to define the rights of A and B in the space of inter-
section. Under the construction of sections 2322 and 2336 we
are within the plain, unambiguous terms of the statute, giving
to every part of it its full meaning and effect. It results in
a beautifully simple means of defining mining rights. The
construction urged by appellees, and supported by the Equator
and subsequent Colorado decisions, violates the language of
the statute, injects into it things not there, results in conflict
in the statute among its parts, and makes infinitely more com-
plex the old system of lode claims.

The case is reversed.

Gooding, C. J., Sloan, J., and Wells, J., concur.